## THE FRANKLIN FOUNDATION *vs.* ATTORNEY GENERAL & others.[1]

Suffolk. November 2, 1993. - December 6, 1993.

Present: LIACOS, C.J., NOLAN, LYNCH, & GREANEY, JJ.

*Franklin Foundation. Boston. Trust*, Charitable trust, Termination. *Statute*, Special law, Construction.

The Legislature, in enacting St. 1958, c. 596, intended to effect the immediate early termination of the trust established in accordance with a codicil to the will of Benjamin Franklin, if this court determined that the purposes of the trust could no longer be met; therefore, in view of the decision in *Franklin Foundation* v. *Attorney Gen.*, 340 Mass. 197 (1961), denying termination because the trust had continuing efficacy, the statute had no applicability to the distribution of the corpus of the trust following its termination in 1991 in accordance with the terms of the codicil. [488-493]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on June 20, 1990.

The case was reported by *Greaney*, J.

*Charles E. Rounds, Jr.*, for the plaintiff.

*David Lee Turner* for Franklin Institute of Boston.

*Richard C. Allen*, Assistant Attorney General (*Leonard Kaplan*, Special Assistant Attorney General, with him) for the Attorney General.

*Mark Sweeney*, Assistant Corporation Counsel, & *Danna M. Crowley*, for the city of Boston, were present but did not argue.

GREANEY, J. A single justice has reserved and reported this case based on the pleadings and a statement of agreed facts and exhibits. The underlying action brought by the

---

[1]The city of Boston, the Commonwealth, and the Franklin Institute of Boston.

plaintiff, The Franklin Foundation (Foundation), is in the nature of interpleader and seeks a declaratory judgment and instructions concerning the appropriate distribution of the corpus of the so-called 200 Year Franklin Accumulation Trust, a trust established in accordance with a codicil to the will of Benjamin Franklin.

The facts relevant to this case are as follows.[2] Franklin died on April 17, 1790, and his will was proved and allowed on April 23, 1790. In a codicil to his will, Franklin left "One thousand Pounds Sterling" to the inhabitants of the city (then a town) of Boston (city). The codicil provided that the fund was to be used to grant loans at five per cent annual interest "to assist young married Artificers in setting up their Business." The codicil further provided:

> "If this Plan is executed and succeeds as projected without interruption for one hundred Years, the Sum will then be one hundred and thirty-one thousand Pounds of which I would have the Managers of the Donation to the Town of Boston, then lay out at their discretion one hundred thousand Pounds in Public Works which may be judged of most general utility to the Inhabitants such as Fortifications, Bridges[,] Aqueducts, Public Building[s], Baths, Pavements or whatever may make living in the Town more convenient to its People and render it more agreeable to strangers, resorting thither for Health or a temporary residence. The remaining thirty-one thousand Pounds, I would have continued to be let out on Interest in the manner above directed for another hundred Years, as I hope it will have

---

[2]Additional background relating to the history of Franklin's codicil can be found in an advisory opinion and several prior decisions of this court which addressed different aspects of the administration of the trust. See *Opinion of the Justices*, 374 Mass. 843 (1978); *Franklin Found.* v. *Collector-Treasurer of Boston*, 344 Mass. 573 (1962); *Franklin Found.* v. *Attorney Gen.*, 340 Mass. 197 (1960); *Franklin Found.* v. *Boston*, 336 Mass. 39 (1957); *Boston* v. *Curley*, 276 Mass. 549 (1931); *Boston* v. *Doyle*, 184 Mass. 373 (1903); *Madden* v. *Boston*, 177 Mass. 350 (1901); *Higginson* v. *Turner*, 171 Mass. 586 (1898).

been found that the Institution has had a good effect on the conduct of Youth, and been of Service to many worthy Characters and useful Citizens. At the end of this second Term, if no unfortunate accident has prevented the (B. Franklin) operation the sum will be Four Million[ ] and Sixty one thousand Pounds Sterling of which I leave One Million Sixty one Thousand Pounds to the Disposition of the Inhabitants of the Town of Boston and Three Millions to the disposition of the Government of the State, not presuming to carry my views farther."

In March, 1791, funds were transferred from Franklin's estate to the city, as trustee, in satisfaction of the bequest. The first loan was made from the fund in May, 1791, and the last loan to a married apprentice was made about 1886. The loans ceased because of, among other things, changing economic conditions and the marked reduction in the number of articled apprentices.

In 1893, the managers of the fund "laid out" $322,490.20, as the one hundred year distribution pursuant to the terms of the bequest (this distribution had been due and payable on July 1, 1891). In 1905, the managers voted to spend a portion of those monies to create the Franklin Union, a technical school designed to train young people for supervisory positions in industry. The city was authorized by statute to maintain the school. St. 1905, c. 488. The school's name was thereafter changed to the Franklin Technical Institute (in 1941), and to the Franklin Institute of Boston (Institute) (in 1961).

In 1957, a special commission was established to study needs and problems facing the school and the Foundation,[3] including what to do with the fund in light of the fact that

[3]The school opened in September, 1908. By St. 1908, c. 569, as amended, the Foundation was created to manage the fund and the school. The city retained legal title to the property comprising the school and to that part of Franklin's bequest which had been expended to establish the school.

one stated purpose of Franklin's bequest (to assist young, married artificers) was no longer applicable. The commission issued its report in February, 1958.

In September, 1958, the Legislature enacted St. 1958, c. 596, which provided in full as follows:

> "SECTION 1. That portion of the fund bequeathed by Benjamin Franklin to the inhabitants of the town of Boston in trust which is distributable to the commonwealth on termination of the trust shall be paid over to The Franklin Foundation for the maintenance, extension or otherwise for the benefit of the Franklin Technical Institute, and as to said portion said trust shall thereupon terminate; provided, however, that such payment shall not be made and said trust as to said portion shall not terminate unless and until a decree of the supreme judicial court authorizes such payment and termination.
>
> "SECTION 2. That portion of the fund bequeathed by Benjamin Franklin to the inhabitants of the town of Boston in trust which is distributable to the city of Boston on termination of the trust shall be paid over to The Franklin Foundation for the maintenance, extension or otherwise for the benefit of the Franklin Technical Institute, and as to said portion said trust shall thereupon terminate; provided, however, that such payment shall not be made and said trust as to said portion shall not terminate unless and until a decree of the supreme judicial court authorizes such payment and termination.
>
> "SECTION 3. The provisions of section two shall take effect upon the acceptance thereof during the current year by vote of the city council of the city of Boston approved by the mayor of said city."

On December 29 and 31, 1958, the Boston city council and the mayor, respectively, accepted and approved § 2 of St. 1958, c. 596, as contemplated by § 3.

In 1959, in furtherance of the legislation, the Foundation filed a bill in equity in the Supreme Judicial Court for Suffolk County seeking "to implement St. 1958, c. 596." *Franklin Found.* v. *Attorney Gen.*, 340 Mass. 197, 198 (1960). In this action, the Foundation claimed that the trust should be terminated because it was no longer possible to find loan recipients who met the requirements of Franklin's codicil. The case was reserved and reported to the full court, which declined to exercise its power to terminate the trust. In so ruling, the following was said:

"We are of opinion that the record does not disclose facts sufficient to cause us to exercise our authority in equity to terminate the trust. We need not speculate as to any other possibilities not now presented. In stating one ground for our opinion we do not intimate that there may not be other serious objections to the plan projected in St. 1958, c. 596. The plaintiff argues as though the making of loans to young artificers was the sole purpose of the testator. We are unable to agree with this contention, as we think that Franklin had another purpose, which was to make a gift to the city at the centennial of the fund, and to the Commonwealth and to the city at the two hundredth anniversary of the fund. . . . We are not convinced that his charitable objectives have ceased to be in accord with the public interest or have become so unreasonable under current conditions that we should exercise our undoubted equitable power of termination even if the loan program has ceased all usefulness." (Footnote omitted.)

*Id.* at 204.[4]

---

[4]A second attempt was made in 1977 to dispose of the trust funds. In that year legislation was proposed in the House of Representatives entitled: "An Act to authorize transfer to trustees of Boston University by The Franklin Foundation and the city of Boston of the ownership and control of Franklin Institute of Boston and exercise by the city of the city's power to dispose of its share of the accumulating bequest of Benjamin Franklin, and to exercise in favor of the trustees of Boston University the Common-

The 1958 legislation has not been repealed or changed. The parties agree that the trust term (the second hundred years) expired on June 30, 1991. As of the date of the parties' agreement in the facts and exhibits, the trust corpus was $4,646,613.48 ($89,688.49 in cash, $1,052,459.74 in treasury bills, and $3,504,465.25 in loans receivable).

The principal antagonists in this case are, on the one hand, the Institute, which contends that St. 1958, c. 596, although held ineffective by the 1960 decision in *Franklin Found.* v. *Attorney Gen., supra,* should now be given effect to require distribution of the trust funds to it, and, on the other hand, the city and the Commonwealth, which maintain that St. 1958, c. 596, has no present applicability.[5]

1. We conclude that St. 1958, c. 596, expresses an intent to effect early termination, and that it cannot be reasonably interpreted to take effect now. Both §§ 1 and 2 of the statute contemplate immediate distribution of the corpus of the trust to the Foundation for the benefit of the Institute and termination of the trust ("as to [each] portion said trust shall thereupon terminate"). This language envisions accelerated payment and termination, and the language is not consistent with expiration at the end of the full term of the trust. Section 3 of the statute states that the provision relating to the city "shall take effect upon the acceptance thereof during the current year" through legislative and executive action. This

wealth's power to dispose of its share of said bequest." 1977 House Doc. No. 5503, at 3. By the bill, the Legislature proposed to exercise in favor of Boston University, and to authorize the city to exercise in favor of Boston University, "[their] power[s] to dispose of [those] part[s] of the gift from Benjamin Franklin to the city of Boston which [are] now accumulating for the second hundred years under the terms of the Will of Benjamin Franklin." *Id.* at § 5. The House requested from this court an advisory opinion as to the constitutionality of 1977 House Doc. No. 5503. This court decided that the bill would have been an unconstitutional application of cy pres by the Legislature, *Opinion of the Justices,* 374 Mass. 843, 851-855 (1978), and the plan died accordingly.

[5]As has been mentioned, the Foundation acts solely as a stakeholder seeking advice on the proper distribution of the funds it cares for. The Foundation makes no arguments one way or the other concerning the continued validity of the statute.

language indicates that the statute was designed to be implemented immediately, and that it was not to have effect thirty-three years later.[6] Although a trust, even one of fixed term, generally does not terminate until the corpus is distributed by the trustees, see *Rothwell* v. *Rothwell*, 283 Mass. 563, 570 (1933), if the statute had been intended to be effective after the trust's normal term, there would have been no need to provide for termination. Termination would have occurred as a matter of course on the distribution of the funds. *Id.*

More significantly, St. 1958, c. 596, provides that the "trust . . . shall not terminate unless and until a decree of the supreme judicial court authorizes such payment and termination." The court authorization spoken of would have been entirely unnecessary had the statute been intended to take effect after the expiration date for the trust stated in the codicil. At the present time, after the expiration of the two hundred year period established by the codicil, distribution of the trust's funds and its termination can take place according to the provisions of the codicil. Neither distribution nor termination requires court authorization. The provision in St. 1958, c. 596, for court authorization thus strongly indicates that the statute was not intended to operate in the manner suggested by the Institute.

The Institute acknowledges the language pointed out earlier, and it recognizes the anomaly of the statute's provision for court authorization.[7] On the latter point, the Institute

---

[6]In this respect, the statute contrasts sharply with the proposed 1977 legislation, which expressed an intent to direct distribution in 1991. If enacted, 1977 House Doc. No. 5503, §§ 1 (c) and 6, would have provided that, in order "to designate that the Franklin Fund be distributed in 1991 to Boston University . . . the Commonwealth hereby exercises in favor of Boston University its power to dispose of that part of the gift from Benjamin Franklin . . . which is now accumulating for the second hundred years . . . ."

[7]The Institute wisely does not argue that the provisions of St. 1958, c. 596, dictating that the trust funds are to be distributed for its benefit are separable from the requirement of court authorization of payment and termination. In view of the statute's direction that "such payment shall not be made and said trust as to said portion shall not terminate unless and until

does not argue that court authorization would be necessary to effect the distribution of the trust funds at the present time. Instead, it contends that the provision in St. 1958, c. 596, for court authorization is merely a "procedural contingency." Although what is meant by the Institute's characterization of the court authorization term as a "procedural contingency" is not entirely clear, it describes that circumstance as "a certain and predictable event which, when it actually happens, occurs, or has been performed, triggers off the legal effectiveness of the statute and transforms a dormant statute into an active statute." Our role with regard to this "procedural contingency," according to the Institute, is "to give effect to the terms of the statute by confirming that the contingency has taken place." We are unpersuaded by this argument. The court authorization provision, as discussed above, has relevance only to the context of St. 1958, c. 596, as a whole, and the provision serves to support the statute's thrust to effect immediate termination of the trust.

2. While the language of St. 1958, c. 596, appears to state its purpose clearly, we acknowledge that the parties have arrived at diametrically opposed interpretations of it. The general rule of statutory construction is that "a statute must be interpreted according to the intent of the Legislature . . . considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975), quoting *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975). Even if we were to assume St. 1958, c. 596, to be ambiguous, its legislative background supports the interpretation discussed in part 1 of this opinion.

The first bill proposed to effect the purpose of what eventually became St. 1958, c. 596, stated that "public policy requires the termination of the trust, if lawfully terminable."

a decree of the supreme judicial court authorizes such payment and termination," a severability argument would not succeed.

1957 Senate Doc. No. 180, preamble. That bill did not pro-
vide expressly for the termination of the trust, but only for
the payment of the fund for the benefit of the Institute, and
then not "unless and until authorized by a decree of the su-
preme judicial court." *Id.* at § 1. Subsequent to the intro-
duction of the bill, a special commission was appointed to
study possible action with regard to the Institute and the
funds available from the Franklin bequest. See Res. 1957, c.
111. The commission issued a report in which it recom-
mended that the bill be changed in its preamble to remove
the reference to termination of the trust and to indicate only
that "the public interest would be better served by *presently*
applying the shares of the fund . . . to the advancement
through technical education of . . . young men" (emphasis
added). 1958 Senate Doc. No. 635, at 10. The commission
described the purposes behind termination, noting that the
Institute "is now in dire need of revenues," and that "there is
a great need to expand our available supply of skilled techni-
cians in the current [Sputnik-generated] race between Soviet
Russia and our own nation in the important field of scientific
competition." *Id.* at 7-8. The commission concluded that dis-
tribution of the funds to the Institute would be "of current
benefit to the Commonwealth and Nation." *Id.* at 8.

The report recommended that the requirement in the body
of the bill for court authorization be removed and that, in-
stead, an advisory opinion as to the legality of the legislation
be sought from this court. *Id.* at 10-11. The commission's
report also included a letter from Mr. Noel Morss, who was,
at the time, counsel to, and vice president of, the Foundation.
Mr. Morss argued in a letter that the Legislature should not
abandon the explicit statutory requirement of court authori-
zation in favor of the advisory opinion procedure. *Id.* at Ex-
hibit C. Mr. Morss described the purpose of the bill as
follows:

"The bill, of course, depends on the proposition that,
construing the intent of the codicil as applied to present
conditions, the purpose for which the testator directed

the continuance of the trust for two hundred years can-
not be served by such continuance, and therefore the
state and the city, as the parties to whose disposition the
fund is left after the termination of the trust, are *now
entitled to have the trust terminate and to dispose of
the fund.* There are other questions, considerations and
arguments, but that is the crux of the matter. We be-
lieve this is good law, and are reasonably confident that
we can so persuade the court, but are not so overconfi-
dent that we consider it safe to forego [*sic*] the opportu-
nity to present the case fully if it can be helped." (Em-
phasis added). *Id.* at 18-19.

Mr. Morss's position was adopted in the bill that was in-
troduced following the commission's report. The new bill re-
tained the language requiring that payment of the shares of
the trust fund not be made "unless and until authorized by a
decree of the supreme judicial court." 1958 Senate Doc. No.
654, § 1. The new bill, did, however, adopt the commission's
recommendation that the preamble be changed to eliminate
the reference to a public policy in favor of termination of the
trust. *Id.* at preamble. Subsequently, a third bill was intro-
duced that omitted the preamble entirely and included in its
body explicit provision for termination of the trust. 1958
Senate Doc. No. 827. The third bill continued to provide for
court authorization of the statute's operation, including both
payment of the fund and termination. *Id.* It was this bill that
was enacted as St. 1958, c. 596.

We are not impressed with the argument by the Institute
that the history of the preamble (which originally referred to
a public policy "requirement" of termination of the trust,
later was changed to state that there was a public interest in
immediate distribution of the trust fund, and finally was de-
leted entirely) indicates that no "present and immediate ter-
mination" was called for. The legislative history confirms
that the intent of St. 1958, c. 596, was to effect immediate
termination of the trust if this court decided that termination
was appropriate because the trust's purposes could no longer

be met. The decision in *Franklin Found.* v. *Attorney Gen.*, 340 Mass. 197 (1960), denying termination because the trust had continuing efficacy, put an end to the vitality of St. 1958, c. 596,[8] which constituted a special purpose statute not meant to have force thirty-three years later.[9]

3. The case is remanded to the Supreme Judicial Court for Suffolk County for the entry of an appropriate declaratory judgment confirming that the trust terminated on June 30, 1991, and instructing that the distribution of the remainder of the trust funds be made by the city and the Commonwealth in accordance with Franklin's codicil.

.                                 *So ordered.*

---

[8]This conclusion disposes of the Institute's argument that a failure to award it the trust funds would divest it of a property interest in violation of its due process rights. Our decisions, here and in *Franklin Found.* v. *Attorney Gen., supra,* do not divest the Institute of property that St. 1958, c. 596, transferred to it; they conclude that the statute did not operate to transfer any property.

[9]It may be useful to point out that, although Franklin's codicil does not state that the city and the Commonwealth are to make their decisions regarding the disposition of the property only after the trust term has expired, such a conclusion is certainly the more reasonable interpretation of it. See *Opinion of the Justices*, 374 Mass. 843, 853 (1978) ("The terms of the will . . . contemplate distribution by the city government in 1991 for purposes chosen in 1991"); *id.* at 855 ("The terms of the will contemplate that the State government in 1991 will distribute the fund for purposes chosen in 1991").